**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

September 4, 2018

BY ECF

The Hon. Edward R. Korman
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *United States v. Francisco Rendon-Reyes*, No. (S1) 15 Cr. 348 (ERK)

Your Honor:

    We write in connection with Francisco Rendon-Reyes's sentencing, currently scheduled for September 13, 2018, at 2 p.m.  On April 5, 2017, Mr. Rendon-Reyes pled guilty pursuant to a plea agreement to Counts One and 26 of the superseding indictment, charging racketeering and interstate prostitution in violation of 18 U.S.C. §§ 1962(c) & 2422(c).  Mr. Rendon-Reyes has admitted as racketeering acts his participation in sex trafficking with respect to Jane Doe #2 (Racketeering Act 4(a)) and interstate prostitution with respect to Jane Doe #10 (Racketeering Act 12(a)).

    The defense respectfully requests a sentence of 60 months' incarceration, a downward variance from the advisory Guidelines range of 87-108 months.  (The PSR incorrectly calculates a higher range based upon an offense level that is two points higher.)  This is not a heartland case.  Mr. Rendon-Reyes's principal offense conduct was to prostitute his wife, in a joint venture they both perceived as normal.  This distorted perspective is traceable to their shared upbringing in Tenancingo, Mexico, where, as discussed below, human trafficking is the community's established path to financial security.

    Of course, that is no excuse for Mr. Rendon-Reyes's crime—he participated in sex trafficking, including, to much a lesser extent, with two other women mentioned in the superseding indictment, and he deserves punishment for what he did.  Rather, our point is that the normalization of trafficking by the family and community that surrounded Mr. Rendon-Reyes from birth distinguishes his conduct from the mine run contemplated by the Guidelines.

The Hon. Edward R. Korman
September 4, 2018
Page 2

Moreover, Mr. Rendon-Reyes was by any measure the least culpable participant in the charged enterprise. Apart from the conduct he engaged in with his wife (Jane Doe #10), he was a peripheral figure who did not commit violence against the women involved. Prostitution was, at one time, normalized for Mr. Rendon-Reyes, but acts of violence were not.

For these reasons, and as set forth below, we urge the Court to impose a sentence of 60 months' incarceration.

**I.      BACKGROUND**

**A.      Mr. Rendon-Reyes's Childhood**

Francisco Rendon-Reyes grew up as the youngest of six siblings in a very poor family. In Tenancingo, poverty is rampant, but his family was among the least well-off. The parents could not provide regular food for their children—most meals were "very small" and there was meat only once a week. (PSR ¶ 106).

Mr. Rendon-Reyes recalls coming home from school and seeing his classmates go to play. He did not have that luxury. From the age of six, he went straight from school to help his father lay masonry foundations—his job was to pass his father construction materials or haul dirt (PSR ¶ 106)—or to take animals out to graze in the fields.

It was an unhappy childhood. (PSR ¶ 106). Although the family was close, Mr. Rendon-Reyes's father was an alcoholic prone to drunken rages. When he drank, he became aggressive, overturning tables and occasionally beating his wife in front of their children, or even the children themselves. Like many children in Mr. Rendon-Reyes's situation, he became hyper-vigilant about protecting his mother and siblings, and, even though he was the youngest, felt it was partly his responsibility to keep the peace within the family.

Mr. Rendon-Reyes continued to work with his father—keeping no money for himself—until the father's death when Mr. Rendon-Reyes was 15 years old. At that point, it was expected that Mr. Rendon-Reyes would begin working himself full-time. So he left elementary school and started masonry work as a teenager, supporting his family with groceries and contributing to the household expenses. His first purchase for himself was his only pair of shoes.

**B.      The Offense Conduct And Sex Trafficking In Tenancingo, Mexico**

Soon after the father's death, Mr. Rendon-Reyes's older siblings made the decision to bring the family into the sex trafficking business. In Tenancingo, trafficking is a well-established avenue out of poverty, and an almost-regular fact of life.

1.      A recent survey shows that four out of five teens in Tenancingo aspire to engage in human trafficking, and this pattern has been repeated for over 40 years. *The Village of Child*

*Pimps*, EL PAIS, June 30, 2013.[1] As the BBC has observed, in an otherwise impoverished community, "[t]he traffickers earn money, allowing them to financially support the community . . . . Trafficking has become an aspiration for young people and even children in the village." *Tenancingo, Travel to the Capital of Sexual Slavery in Mexico*, BBC NEWS.COM, May 22, 2012.[2]

Indeed, it is not uncommon for a poor Tenancingo couple to engage in a sex-trafficking venture for a number of years, buy some land, and then proceed to live out the rest of their life without crime. The origins of their wealth are not discussed. Their children grow up middle-class and go on to be doctors, lawyers and business owners. This is vividly depicted in the city's housing: "[t]he cinderblock houses that line the main street stand in contrast with the luxurious and colorful four-story homes that are the symbols of the city's booming sex trafficking industry. Police say traffickers use the mansions to flaunt their power." Jennifer Gonzalez Covarrubias, *Tenancingo, the sex slavery capital of Mexico*, YAHOO NEWS (Feb. 2, 2018), https://www.yahoo.com/news/tenancingo-sex-slavery-capital-mexico-165823010.html.

This is the model for upward mobility that Mr. Rendon-Reyes's siblings appropriated for the family. Mr. Rendon-Reyes followed along. He did so because he felt a responsibility from his childhood to support his family whatever wrongs they did, and also because, while he understood trafficking was wrong, the path was normalized for him by his community and his older siblings.

2. However, Mr. Rendon-Reyes's own conduct was mostly peripheral to the larger enterprise, and it involved none of the violence, sexual assault, or other acts of degradation that other participants engaged in. He was, by any degree, the least culpable member of the charged enterprise. For example, his only role with respect to Jane Doe #6 was to help his brother smuggle her across the border. (PSR ¶ 26). He is not alleged to have participated in her prostitution.

Mr. Rendon-Reyes's role with respect to Jane Doe #2 was, as the PSR discusses, to occasionally help his brother coordinate her prostitution trips. (PSR ¶¶ 16-17). But he did not hit or threaten Jane Doe #2, he maintains that he was largely unaware of his brother's violence against her, and he strenuously denies withholding feminine hygiene products and clothing from her (*see* PSR ¶ 16). He insists that if he had known she was in need, he would have given her money to buy those items.

Rather, the vast bulk of Mr. Rendon-Reyes's personal participation involved the prostitution venture with (and of) Jane Doe #10. This woman was his own partner and the

---

[1] Juan Diego Quesada, *El Pueblo de los Niños* Proxeneta. EL PAIS (Jun. 30, 2013), http://internacional.elpais.com/internacional/2013/06/30/actualidad/1372556638_992102.html (profiling the conditions in Tenancingo and the culture that perpetuates sex trafficking. The title translates as "The Village of the Pimp Children.").

[2] Ignacio de los Reyes, *Tenancingo, Viaje a la Capital de la Esclavitud Sexual en México*, BBC WORLD (May 22, 2013), http://www.bbc.co.uk/mundo/noticias/2012/05/120522_trata_mujeres_mexico_eeuu_sexual_pea.shtml.

mother of his children, which illustrates how normalized the conduct was for Mr. Rendon-Reyes. As the PSR discusses, Jane Doe #10 lived and worked as a prostitute with Mr. Rendon-Reyes for years, and recruited and managed other prostitutes herself. (PSR ¶¶ 30-32).

      3.      Jane Doe #10 also shared a life with Mr. Rendon-Reyes. As perverse as it may be, it appears they conceived of the prostitution as a joint venture to support that life. Indeed, they have been together since 2007, crossed the border together that same year, and decided to have a family in 2010. It had always been Mr. Rendon-Reyes's dream to have children in the United States, where there are meaningful opportunities for education and work.

      The couple's first-born child was a miracle. They tried and failed to conceive for several months, and were told by a doctor that they could not, when unexpectedly they succeeded. Then, a few months into the pregnancy, the doctor told them that there was a significant risk the child would be born with Down's Syndrome, and they would only know conclusively by using a test that itself risked killing the fetus. The couple decided that they would love the baby no matter what God provided, and chose not to perform the test. A few months later, the doctor had more bad news: the baby's intestines had not properly developed, and the risk for an abnormal birth was high. The couple again prayed for the best, and Mr. Rendon-Reyes still thanks God that his son was born healthy, against the odds.

      After the child's birth, Mr. Rendon-Reyes wanted to give him the chance at a normal life. He made plans to eventually divest his own family from the enterprise. Applying the work ethic he learned from his father, he found steady, lawful employment, and worked as many hours as he could. He washed dishes, bussed tables, stocked inventory, and picked up odd jobs. (PSR ¶¶ 115-16). He made his son's education a priority, and made it a point to go to all his parent-teacher conferences.

      Shortly after Mr. Rendon-Reyes was arrested, the couple's second child was born. Mr. Rendon-Reyes is now responsible for two young people, and he understands that his conduct means they cannot have a normal life here in the United States. Rather, he will be deported to Mexico after his prison term, and the plan is for his children to follow him there so they can build a new life together. The Tenancingo path is now closed (indeed, Mr. Rendon-Reyes's own mother is incarcerated in Mexico), but even were that not so, Mr. Rendon-Reyes would not walk it again.

      He has renounced his old life. All he wants is to give his children the simple life he once had as a child: hard work for an honest living, free of the crime and victimization that made a wreckage of his own family and so many others. Mr. Rendon-Reyes has a chance to model for his children the difference between right and wrong, and he asks this Court to allow him to do so before they are old enough to fall into the same trap he did.

The Hon. Edward R. Korman
September 4, 2018                                                                                                              Page 5

## II.   APPLICABLE SENTENCING LAW

### A.   The Statutory Sentencing Factors

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)," which in turn sets forth that the applicable purposes are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution. In every case, the sentencing court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

### B.   Objections To The PSR's Guidelines Calculation

We object to two aspects of Probation's Guidelines calculation relating to the sex trafficking counts/acts, which yield the highest (and thus the operative) offense level. (*See* PSR ¶ 61; Plea Agreement at 4).

#### 1.   Objection To The U.S.S.G. § 2G1.1(c)(1) Cross-Reference

Consistent with the plea agreement, the correct base offense level for these counts is 34, pursuant to U.S.S.G. § 2G1.1(a)(1) (which applies in light of the underlying racketeering activity being sex trafficking). The PSR uses a different analysis, which is incorrect.

In particular, the PSR applies the cross-reference set forth in U.S.S.G. § 2G1.1(c)(1) to the sexual abuse guideline, U.S.S.G. § 2A3.1. It does so on the rationale that "the defendant and his co-defendants used force and threats of force and serious bodily injury" against Jane Doe #2, and therefore that the offense involved the "means set forth in 18 U.S.C. § 2241(a)" (which proscribes causing "another person to engage in a sexual act (1) by using force against that other person; or (2) threatening or placing that other person in fear that any

The Hon. Edward R. Korman
September 4, 2018                                                                                                   Page 6

person will be subjected to death, serious bodily injury, or kidnaping"). The PSR thus arrives at a base offense level of 30 and a four-point enhancement under § 2A3.1 for those reasons. (PSR ¶¶ 51, 61-62).

This approach is mistaken. As the plea agreement reflects, the cross-reference does not apply to Mr. Rendon-Reyes's own conduct because his offense did not "involve[] conduct described in 18 U.S.C. § 2241(a)." Rather, as discussed above, Mr. Rendon-Reyes did not use, and is not alleged to have used, any "force" or "threats of force and serious bodily injury" to Jane Doe #2, or anyone else for that matter. Nor did he plead to doing so. There is therefore no basis to apply the sexual abuse cross-reference. The base offense level should therefore be 34.

### 2. Objection To The Vulnerable Victim Enhancement

In light of the fact that § 2G1.1 applies, not the sexual abuse cross-reference, there should be no further enhancement to the base offense level. (This is why the above argument makes a difference, even though the end result for both analyses is the same level, *i.e.*, 34). The PSR applies a two-point "vulnerable victim" enhancement under U.S.S.G. § 3A1.1(b)(1) (PSR ¶ 63), as does the plea agreement, but this is inappropriate.

U.S.S.G. § 3A1.1 is designed to punish defendants who select victims so vulnerable as to make the crime unusually abhorrent. "The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure, or in the robbery where the defendant selected a handicapped victim." U.S.S.G. § 3A1.1, app. n. 2. The victim must be differentiated from other typical victims of that crime by a vulnerability that goes beyond the level of vulnerability necessary to commit the crime in most instances.

The government has previously endorsed precisely this standard as the authoritative interpretation of § 3A1.1:

> As the Solicitor General has contended, section 3A1.1 was intended to apply only when the special vulnerability of the victim makes the offender more culpable than he otherwise would be in committing the particular offense. When circumstances "differentiate the victim from the typical victim of that particular crime, so that the defendant's conduct was more culpable than that of the typical perpetrator of that crime," enhancement under section 3A1.1 is justified because the defendant's offense level does not otherwise account for his heightened culpability. In contrast, when the victim is the typical victim of the crime, a section 3A1.1 enhancement is improperly duplicative because the defendant's offense level already accounts fully for the level of culpability which the Sentencing Commission ascribed to that crime.

*United States v. Morrill*, 984 F.2d 1136, 1138 (11th Cir. 1993) (citations omitted).[3]

---

[3] In a similar sex trafficking prosecution before Judge Matsumoto, *United States v. Granados*, No. 11 Cr. 297, the government did not object to the exclusion of the vulnerable victim enhancement on similar facts.

The standard is not met when the victim is more vulnerable than most. Their condition must make them "particularly" vulnerable, to the point of being substantially unable to avoid being a victim of the crime. *United States v. McCall*, 174 F.3d 47, 51 (2d. Cir. 1998). The vulnerability must also be "unusual," beyond the traits many victims of the crime may be expected to possess. *See United States v. Paige*, 923 F.2d 112, 113-14 (8th Cir. 1991) (reversing application of enhancement even though defendant targeted young store clerks because he considered them inexperienced and naive; such clerks were not unusually vulnerable); *United States v. Moree,* 897 F.2d 1329 (5th Cir. 1990) ("The vulnerability that triggers §3A1.1 must be an 'unusual' vulnerability which is present in only some victims of that type of crime. Otherwise, the defendant's choice of a likely victim does not show the extra measure of criminal depravity which §3A1.1 intends to more severely punish.").

To be sure, the women the Rendon-Reyes family trafficked were "young, poor, and uneducated women from impoverished areas of Mexico." (PSR ¶ 51). But the sad reality is that these characteristics are not unusual or atypical—they do not distinguish the victims in this case from the traits many, if not most, victims of sex trafficking may be expected to possess. They therefore do not rise to the level at which the §3A1.1 enhancement is appropriate. *See, e.g.*, *United States v. Sabatino,* 943 F.2d 94, 103 (1st Cir. 1991) ("[A]n adjustment for vulnerable victims under U.S.S.G. § 3A1.1 would have been proper only if the young women employed as prostitutes by the [Defendants] were 'unusually vulnerable,' that is, 'unusually vulnerable' given the kind of victim that is typically involved in a Mann Act violation and that Congress aimed to protect.").

Indeed, it is clear that Congress considered the very characteristics cited by Probation when writing the governing statutes. In the legislative history of the Victims of Trafficking and Violence Protection Act of 2000, which established 18 U.S.C. § 1591, a House Committee observed that "[t]raffickers primarily target women and girls, who are *disproportionately affected* by poverty, lack of access to education, chronic unemployment, discrimination, and lack of viable economic opportunities in countries of origin. Traffickers lure women and girls into their networks through false promises of good working conditions at relatively high pay . . . . Traffickers also buy girls from poor families and sell them into prostitution or into various types of forced or bonded labor." H.R. Rep. No. 106-939 (2000). Congress understood the tragic vulnerability of typical victims when establishing the Guidelines for 18 U.S.C. § 1591, and the base offense level of §2G1.1 therefore reflects the depravity inherent in the typical instance of the offense. Here, the base offense level of 34 already contemplates victims from the circumstances cited by the PSR, and no further enhancement is appropriate.

\*   \*   \*

Apart from the disagreement with the vulnerable victim enhancement set forth above, the defense otherwise agrees with the Guidelines computation set forth in the plea agreement. The total adjusted offense level for the Jane Doe #2 sex trafficking counts is thus 34 (rather than the government's calculation of 36); the total adjusted offense level for the alien smuggling and transportation counts is 15; the total adjusted offense level for the Jane Doe #6 counts is 18; and the total level for the Jane Doe #10 counts is 14. There is no grouping

adjustment, which means the total operative offense level is 34 on the defense view. With the three-point downward adjustment for acceptance of responsibility, and the further two-point downward adjustment in light of the global resolution, the total offense level is 29.

Because Mr. Rendon-Reyes is at Criminal History Category I, his advisory Guidelines range is 87-108 months.

However, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence. *See also Pepper v. United States*, 562 U.S. 476, 490 (2011). A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

### III.   ARGUMENT

A sentence of five years' incarceration is sufficient, but not greater than necessary, to comport with the purposes of sentencing in this case.

This was a terrible crime. A significant penalty is warranted. We submit that a term of sixty months achieves that goal, while also being tailored to Mr. Rendon-Reyes's specific offense conduct. *See Gall v. United States*, 552 U.S. 38, 54 (2007) (observing that an overly harsh sentence "may work to promote not respect, but derision of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing"). As discussed above, Mr. Rendon-Reyes was by any measure the least culpable participant in the charged enterprise. He did not commit violence, and was largely a peripheral player, with the exception of the prostitution venture he undertook with his own wife.

That venture reflects the distorted, but very real, truth that trafficking was a normal activity for the family and community in which Mr. Rendon-Reyes was raised. This does not excuse his actions. But just as his refusal to participate in violence distinguishes him from his co-defendants, his being raised by an entire community to believe that trafficking was tolerable distinguishes him from trafficking defendants who depart from a proper moral perspective.

A sentence of five years would also take into account Mr. Rendon-Reyes's family circumstances. Upon his release, his oldest child would still be young enough for Mr. Rendon-Reyes to make good on his promise to model for him the difference between right and wrong. As discussed above, Mr. Rendon-Reyes asks for nothing more than the opportunity to live the life he had as a child: a life of honest but hard work in Mexico. He understands that he and his children will be returning to poverty, but he is determined never to victimize another person, and he is equally determined to ensure that his children will grow up right.

The Hon. Edward R. Korman
September 4, 2018                                                                                            Page 9

      Mr. Rendon-Reyes is deeply remorseful for what he did. He will tell the Court as much in his own words. We ask that the Court take into consideration the statutory factors discussed above, and impose a merciful sentence of 60 months.

      Respectfully submitted,

      /s James Darrow

      James Darrow
      Len H. Kamdang
      Assistant Federal Defenders
      Federal Defenders of New York, Inc.
      Tel. (718) 407-7419
      Fax: (718) 855-0760
      james_darrow@fd.org
      len_kamdang@fd.org

      *Attorneys for Francisco Rendon-Reyes*

cc:    Counsel of record (by ECF)
        Senior U.S. Probation Officer Patricia A. Sullivan (by email)